John Patrick PRENGER, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–02–00715–CR.

Court of Appeals of Texas,
Houston [14th Dist.].

May 29, 2003.

Donald W. Bankston, Richmond, J., for appellant.

David Christopher Newell, Richmond, for appellee.

Panel consists of Chief Justice BRISTER and Justices FOWLER and FROST.

## OPINION

WANDA McKEE FOWLER, Justice.

A jury found appellant John Patrick Prenger guilty of manslaughter in the death of his girlfriend's four-year-old son, Cody Barree. The child died of asphyxiation some time after appellant wrapped him in a blanket and secured it with belts at his chest and feet, apparently in an effort to control the child's behavior. Appellant was sentenced to twenty years' confinement in the Texas Department of Criminal Justice, Institutional Division, and fined $10,000. In a single issue, appellant contends the trial court erred in denying his requested jury instruction on justification under section 9.61 of the Texas

Penal Code as a defense to murder and manslaughter charges. Finding no evidence that the type of binding appellant used could not cause death, we affirm.

## BACKGROUND

Appellant lived with his girlfriend, Tanya Baird, and two of her children, four year old Cody and his brother, Russell. In the early morning hours of Saturday, June 24, 2000, appellant called an ambulance to their apartment when he discovered that Cody was unconscious. Cody was taken to a hospital where he later died.

Prior to appellant's arrest, he was interviewed at the hospital by a police detective. The interview was tape-recorded and played for the jury at appellant's trial. In the interview, appellant explained that Cody had been increasingly misbehaving over the past several days, and that he and Tanya had been unsuccessful in their attempts to discipline him. He stated that they had "whipped him" for "four days straight," but because Cody began bruising, they tried other methods. On Thursday night, they tried wrapping Cody in a blanket and confining him with belts at the chest and legs to prevent him from getting up at night and wandering around, and "throwing a fit." This apparently worked, so the next day, Friday, appellant again wrapped Cody in a blanket and secured it with belts at the chest and feet.

Cody was apparently confined this way periodically during the day, although appellant stated that he would check on Cody and let him out for two or three hours at a time to eat, drink, and use the bathroom. Appellant also stated that Cody got up and tried to cover Russell with a pillow and was "acting violent" before he put him in the blanket.[1] When appellant later checked on Cody,[2] he found Cody was not responsive, and so he removed the belts and the blanket to try to revive him. He also alerted Tanya and called for the ambulance. During the interview, appellant repeatedly stated that he never would have thought or suspected something like that could happen, especially since the restraint had "worked fine" the night before, and he never intended to harm Cody.

Dr. Lee Ann Krishnan, the medical examiner who performed the autopsy on Cody, testified at trial that she determined the cause of death to be "consistent with asphyxia, secondary to constriction of the chest." Dr. Krishnan further testified that Cody died a very slow death. She also opined that, based on the way the death was described in the police reports, it may have taken hours for Cody to die in circumstances in which his breathing became more and more shallow as he began to tire from having to breathe against the pressure on his chest, until he could no longer get enough oxygen to keep his brain and heart functioning, and he finally became comatose and died.

1. Other witnesses testified to Cody's difficult behavior. Gayle Farley, Tanya Baird's mother and Cody's grandmother, testified regarding two conversations she had with Tanya about the problems she was having with Cody. The first conversation took place one week before Cody's death. The second conversation was a phone call at 8:30 p.m. on the day before Cody died, and Tanya told Farley about Cody getting up at night and putting a pillow over Russell's face. Later, after Cody's death, Farley testified that she said to a detective on the case "I'm wondering if that just happened because [appellant] was at the end of his rope?" Another witness, Shari Stevens, who had been a babysitter for Tanya, described Cody as a very unhappy baby who cried all the time, and an "aggressive bad boy" whose behavior became worse over time.

2. We cannot tell from the record how long appellant would leave Cody bound in the blanket.

The jury also heard the testimony of Dr. Carmen Petzold, a psychologist in private practice, who was retained by appellant. She testified that children who exhibit "extreme" and dangerous behavior may be hospitalized, and may have to be restrained because of the danger to themselves and others. Dr. Petzold described various types of restraints that may be used in healthcare facilities, and testified that the use of a restraint on Cody would meet the Joint Commission on Accreditation of Healthcare Organizations (JCAH) guidelines for the use of restraints because he tried to smother his brother with a pillow.

However, on cross-examination, Dr. Petzold admitted that there was no restraint she knew of in which someone is rolled up in a blanket and tied at their chest and legs. She clarified her earlier statement by explaining that restraint may be justified when someone is in danger of hurting themselves or others. She admitted that the way Cody was restrained was not proper, and it was not something she would have done. Then, the following exchange occurred as the State continued its cross-examination:

Q. (By Mr. McAlister) Based on your 25 years of experience prior to Cody's death, would you have thought it would be dangerous to wrap a child up in a blanket, constrict his chest with a belt and tie his feet up with a belt?

A. Yes.

Q. So, for the average person on the street and for JCAH, that would not be a recommended method of restraint?

A. Of course not. JCAH has all these other terrific mechanical restraints that you can use.

Q. Do you think that the average person would believe that that is an accepted method of restraint of a child?

A. Yes, I do think—I think that an average uneducated person trying to control a dangerous, out-of-control child could think that this could work, yes.

Later, on redirect, Dr. Petzold elaborated on the basis for her opinion, testifying that the average person in the same situation would be influenced to believe the use of such a restraint was not dangerous by factors such as the knowledge that hospitals and other institutions use similar restraints, the accepted use of restraints by law enforcement officials, and, as in the present situation, the fact that the restraint had been used successfully before to restrain the child's behavior without harm. She also stated that it was important to consider that many other types of discipline had been tried and failed when evaluating the reasonableness of restraining the child.

At the charge conference, prior to closing arguments, appellant objected to the prepared charge and requested an instruction on the defense of justification under section 9.61 of the Penal Code for all the charged offenses. Under section 9.61 of the Penal Code, a person acting "in loco parentis" to a child is justified in using force, but not deadly force, "when and to the degree the person reasonably believes the force is necessary to discipline the child or to safeguard or promote his welfare." *See* TEX. PEN.CODE ANN. § 9.61. As prepared, the charge limited the justification instruction to the offense of injury to a child. Appellant requested that the defense be included with all the other charged offenses, including murder, manslaughter, criminally negligent homicide, and endangering a child. After hearing argument, the trial court determined that the instruction was not applicable because

deadly force was used, and overruled the objection. The jury subsequently acquitted appellant of murder, but found him guilty of manslaughter.

## DISCUSSION

On appeal, appellant contends the trial court erred in denying his requested jury instruction on justification under section 9.61 of the Penal Code for the defense of murder and manslaughter, and that the error was harmful. Appellant argues the trial court was required to instruct the jury on justification because he presented more than a scintilla of evidence raising the issue, and its error precluded the jurors from acquitting him of manslaughter.

### 1. Preservation of Error

■■■ As an initial matter, the State suggests that appellant failed to preserve error because no written request appears in the record, and the instruction read into the record applied only to the offense of injury to a child. However, as the State acknowledges, appellant requested that the instruction be applied to all charged offenses, and our review of the record confirms that the trial court clearly understood appellant's objection and request. Moreover, the requirement that the instruction be in writing is complied with if the instructions are dictated to the court reporter in the presence of the trial court and the State's counsel, before the reading of the court's charge to the jury. TEX. CODE CRIM. PROC. ANN. art. 36.15 (Vernon Supp.2003). Here, appellant presented his objection to the trial court before the charge was read to the jury, dictated the form of the proposed instruction he requested be included with each charged offense, and the trial court, after hearing argument, refused his request. We find that appellant sufficiently preserved error. *See* TEX.CODE CRIM. PROC. ANN. art. 36.14, 36.15.

### 2. Standard of Review

■■■ A defendant in a criminal prosecution has the right to a jury instruction on any defensive issue that is raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the evidence. *See Granger v. State,* 3 S.W.3d 36, 38 (Tex.Crim.App.1999) (op. on reh'g). This rule is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence. *Id.* When a judge refuses to give an instruction on a defensive issue because the evidence supporting it is weak or unbelievable, he effectively substitutes his judgment on the weight of the evidence for that of the jury. *Woodfox v. State,* 742 S.W.2d 408, 410 (Tex.Crim.App.1987). However, if the evidence, viewed in the light most favorable to the defendant, does not establish the defensive issue, the defendant is not entitled to an instruction on the issue. *See Granger,* 3 S.W.3d at 38.

■■■ If the reviewing court determines that the trial court erred in refusing to include the requested instruction in the charge, it must then determine whether the error was harmful to the defendant. *See Payne v. State,* 11 S.W.3d 231, 232 (Tex.Crim.App.2000); *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (op. on reh'g). If the error in the charge was the subject of a timely objection in the trial court, then reversal is required if the error is "calculated to injure the rights of defendant," which means that there must be some harm to the accused from the error. *See* TEX.CODE CRIM. PROC. ANN. art. 36.19 (Vernon 1981); *Almanza,* 686 S.W.2d at 171. We must examine the relevant portions of the entire record to determine whether appellant suffered any actual harm as a result of the error. *See Arline*

*v. State,* 721 S.W.2d 348 (Tex.Crim.App. 1986).

### 3. Did the Trial Court Err in Refusing to Apply the Justification Defense to the Offenses of Murder and Manslaughter?

Appellant contends he raised the issue of justification under section 9.61 of the Texas Penal Code, and therefore the trial court erred in refusing to apply it to the charged offenses of murder and manslaughter. Section 9.61 provides as follows:

(a) The use of force, but not deadly force, against a child younger than 18 years is justified:

(1) if the actor is the child's parent or stepparent or is acting in loco parentis to the child; and

(2) when and to the degree the actor reasonably believes the force is necessary to discipline the child or to safeguard or promote his welfare.

(b) For purposes of this section, "in loco parentis" includes grandparent and guardian, any person acting by, through, or under the direction of a court with jurisdiction over the child, and anyone who has express or implied consent of the parent or parents.

TEX. PEN.CODE ANN. § 9.61. Appellant argues that all the evidence shows he was attempting to discipline and restrain Cody. Specifically, appellant points to (1) the testimony of Dr. Petzold that a reasonable person might have believed the restraint was necessary to safeguard the child, and (2) appellant's lack of intent or knowledge that his actions were capable of causing death or serious bodily injury. Appellant further argues that neither the language of section 9.61 nor case law interpreting the statute limits the application of the defense to murder and manslaughter.

Our review of the case law leads us to conclude that appellant incorrectly relies on his subjective knowledge or on a reasonable person's belief that restraint might be necessary; these facts do not support submission of the issue. Instead, we must look for any evidence that deadly force was not used. *See* TEX. PEN.CODE ANN. § 9.61(a)(2) (providing that the use of force, but not deadly force, is justified when and to the degree the actor reasonably believes the force is necessary to discipline the child or to safeguard or promote his welfare).

We reach this conclusion based on *Ferrel v. State,* 55 S.W.3d 586 (Tex.Crim.App. 2001). There, the Court of Criminal Appeals considered the analogous question whether a defendant was entitled to a self-defense instruction under section 9.31 of the Penal Code; that section provides that a person is justified in using non-deadly force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. *Ferrel,* 55 S.W.3d at 591–92. In that case, during an altercation in a pool hall, Ferrel hit another man in the mouth with a beer bottle. The man fell straight back, hit his head on the floor, and died. A jury convicted Ferrel of aggravated assault. *Id.* at 587.

In determining whether Ferrel was entitled to the section 9.31 self-defense instruction, the Court of Criminal Appeals first emphasized that section 9.31 applies to the justifiable use of non-deadly force, unlike section 9.32, which applies to the justifiable use of deadly force. *Id.* at 591. Having noted this important distinction, the Court reviewed the record to determine "whether there was evidence that Ferrel did not use deadly force." *Id.* The Court began with the Texas Penal Code definition of "deadly force" as "force that

is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* at 591–92. As the Court explained:

> For there to be evidence that Ferrel did not use deadly force, there must have been evidence that the beer bottle was not capable of causing death or serious bodily injury in the manner of its use or intended use. The Court of Appeals held that Ferrel was entitled to a § 9.31(a) self-defense instruction based on the faulty assumption that there was evidence that the beer bottle did not cause serious bodily injury and that, in the manner the bottle was used, it was incapable of causing serious bodily injury. Because we have found that the actual blow of the bottle indisputably caused serious bodily injury to Mc-Manus, Ferrel by definition used deadly force. Hence, a § 9.31(a) self-defense instruction is not applicable and the trial court did not err in refusing to give one.

*Id.* at 592 (footnotes omitted).

 We find the *Ferrel* court's reasoning instructive. Section 9.61, like section 9.31, provides only for the use of non-deadly force. As defined, "deadly force" is either (1) force that is intended or known by the actor to cause death or serious bodily injury, or (2) force that is capable of causing death or serious bodily injury in the manner of its use or intended use. *See Ferrel,* 55 S.W.3d at 591–92. The State does not argue that appellant intentionally or knowingly sought to cause death or serious bodily injury by restraining Cody as he did. Therefore, the only issue is

whether there was any evidence that the restraint of a blanket secured by belts at the chest and feet was not capable of causing death or serious bodily injury in the manner of its use or intended use.

We have reviewed the record and find no evidence to support this conclusion. While Dr. Petzold testified that the use of restraints may be appropriate in some circumstances to protect a child or others from harm, she also testified that the method appellant used was not recommended and was inappropriate. In fact, Dr. Petzold agreed that wrapping a child up in a blanket, constricting his chest with a belt, and tying his feet up with a belt would be dangerous. Moreover, when asked hypothetically how tight such a restraint should be on a child, she testified that it should be "not so tight as to constrict their breathing." She did not testify that the blanket and belt restraint was not capable of causing death or serious bodily injury. She also acknowledged that—even when used by hospitals and other agencies—restraints are dangerous and deaths occur each year.

Appellant's testimony that he never intended to harm Cody, and his prior use of the restraint without harm, is not evidence that the restraint was not capable of causing death or serious bodily injury. Moreover, it is undisputed that Cody actually died from appellant's use of the blanket and belt restraint. Appellant does not challenge the legal or factual sufficiency of his conviction for manslaughter. Therefore, by definition, appellant used deadly force. *See id.* at 592. The trial court did not err in refusing the instruction.[3]

**3.** In support of his issue, appellant cites two cases, *Teubner v. State,* 742 S.W.2d 57 (Tex. App.-Houston [14th Dist.] pet. ref'd), and *McClinton v. State,* 647 S.W.2d 400 (Tex.App.-Fort Worth 1983, pet. ref'd). Appellant argues these cases demonstrate that the availability of the defense is determined by the type and reasonableness of force used, not whether death results. *Teubner* is inapplicable because it did not address the issue whether an instruction under section 9.61 was warranted. In *McClinton,* the Fort

The judgment of the trial court is affirmed.

Worth court of appeals did note the severity of the beatings given the child, but, ultimately, it pointed out that the behavior killed the child and therefore it did not qualify as non-deadly force. 647 S.W.2d at 407. Thus, neither case assists appellant and, more importantly, the Court of Criminal Appeals has spoken via *Ferrel* and instructed the courts to look to the result the behavior could cause.